AUGUST R. SHERMAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sherman v. Commissioner
Docket No. 1854-72.
United States Tax Court
T.C. Memo 1977-261; 1977 Tax Ct. Memo LEXIS 182; 36 T.C.M. (CCH) 1055; T.C.M. (RIA) 770261; August 10, 1977, Filed *182 Petitioner, a college graduate knowledgeable in accounting, consistently failed to report a substantial part of his income and pay taxes thereon. Petitioner's only records from his sole proprietorship were maintained in a false and misleading manner. During audit, petitioner frequently made false statements to Internal Revenue Service agents concerning the accuracy and method of keeping his sole proprietorship's records, the ownership of certificates of deposit, money orders, and savings bonds, and the existence of undisclosed bank accounts maintained under assumed names. Held, some part of the underpayment of tax required to be shown on each of petitioner's Federal income tax returns for 1962, 1963, 1964, and 1965, was due to petitioner's fraud with an intent to evade tax. Therefore, the addition to tax for fraud under sec. 6653(b), I.R.C. 1954, is applicable. Held further, respondent is not barred by the statute of limitations from assessing deficiencies for the years in question. Sec. 6501(c)(1), I.R.C. 1954. Gary Eldredge, for the petitioner. Edward G. Lavery, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following *183 deficiencies in petitioner's income tax: Addition to Tax Year
Income Tax
[1] Under Sec. 6653(b) 1962
$1,470.31
$ 735.15
1963
1,790.06
895.03
1964
4,368.71
2,184.35
1965
4,239.12
2,119.56
The parties have stipulated that respondent correctly determined petitioner's income tax deficiencies. The sole issue we must decide is whether any part of the underpayment of income tax was due to petitioner's fraud. Resolution of this issue will determine whether assessment of income tax deficiencies is barred by the statute of limitations. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner was a resident of Maryville, Missouri, when he filed his petition in this case. Petitioner and Lucille Sherman, his wife from 1942 until 1967, timely filed joint income tax returns for 1962, 1963, 1964, and 1965, with the District Director of Internal Revenue, St. Louis, Missouri. In December 1967, petitioner and Lucille Sherman (sometimes referred to as petitioner's ex-wife) were divorced. Petitioner's primary source of income during the years in question was a sole proprietorship, Sherman Lightning *184 Protection Company (hereinafter SLP), that petitioner owned and operated. SLP engaged in retail sales and installation of lightning rods. In addition to income from SLP, petitioner and his ex-wife received income from United Lightning Protection Company, a partnership that was formed by petitioner, his ex-wife, and petitioner's brother Russell. United Lightning Protection Company engaged in the manufacture and wholesale distribution of aluminum lightning rods. Petitioner's only records of SLP's gross receipts and disbursements were bank statements, cancelled checks, deposit slips, adding machine tapes, and expense invoices; SLP kept no formal books.In order to determine gross income derived from SLP's operation, petitioner employed a bank deposit method. Under this method, petitioner added together all bank deposits made to SLP's business account, subtracted from this sum all non-income items deposited in the account during the year, and adjusted the remainder for SLP's beginning and ending accounts receivable. This final figure, along with other summarized income tax information, petitioner personally delivered to Harold E. Gasper, a certified public accountant. Gasper or a member *185 of his staff used the summarized figures and additional oral information given to him by petitioner to complete petitioner's Federal income tax returns. The parties stipulated at trial that SLP's gross income, as reported on petitioner's income tax returns, equalled the gross deposits into SLP's bank account, less non-income items, with adjustments for SLP's beginning and ending accounts receivable. Petitioner was the only person who took care of SLP's records. He also compiled all records concerning his and his ex-wife's personal finances so that Gasper or a member of his staff could complete their joint income tax returns. While undergoing audit by the Internal Revenue Service, petitioner was personally interviewed on four occasions by Special Agent William Honer. During the first interview, on June 21, 1966, Horner was accompanied by an Internal Revenue Agent, Paul Roper. At the second interview, on March 1, 1967, Horner was accompanied by Roper and Harold E. Gasper, petitioner's accountant. At the third interview, occurring March 14, 1967, at petitioner's bank, Citizen's State Bank, Maryville, Missouri, Horner was accompanied by Internal Revenue Agent Jim Berls.At the final *186 interview on April 16, 1968, occurring at petitioner's residence, Horner was accompanied by Roper. On three occasions--June 21, 1966, March 1, 1967, and March 14, 1967--petitioner was asked whether he had deposited all of SLP's gross receipts in SLP's business account. On all three occasions, petitioner replied that all of SLP's gross receipts had been properly deposited during the years in question.The parties now agree that, during the years in question, petitioner received at least 52 payments in connection with SLP's business activities, totaling over $11,125, that were not properly deposited in SLP's business account. Many of these income items were cashed on the same day that petitioner deposited other income items in SLP's business account. Some of the items not deposited were then used to make loan and interest payments, and some were converted into money orders.
During Horner's June 21, 1966, meeting with petitioner, petitioner was asked whether he purchased any cashier's checks, money orders or bank drafts. Petitioner responded that he never used such mediums of exchange. The parties have now stipulated that during the years in question petitioner purchased 13 bank drafts *187 or money orders totaling $15,493.10. During Horner's March 14, 1967, interview with petitioner, petitioner was asked whether from 1961 until March 14, 1967, petitioner maintained any bank accounts in his name or any other name in St. Joseph, Missouri. Petitioner responded that he did not. The parties now agree that from August 25, 1966 until December 2, 1966, petitioner maintained a checking account in St. Joseph, Missouri, under the name August Ross. Petitioner also maintained an account from December 2, 1966 until at least March 13, 1967, in St. Joseph, Missouri, under the name Al Cozadski. Between August 25, 1966 and December 31, 1966, over $30,000 was deposited in these two accounts. One day prior to petitioner's March 14, 1967, interview with Horner in which petitioner denied having any checking accounts not previously disclosed, petitioner drew a check for $33,909.78 on the Al Cozadski account. Also during the March 14, 1967, interview, petitioner maintained that $6,000 in savings bonds, found in his safe deposit box, were the only savings bonds he had owned. The parties now agree that during the period 1962 through 1965, petitioner owned over $15,000 in savings bonds. *188 After completing a net worth audit on petitioner, the Internal Revenue Service determined petitioner understated his taxable income in the following amounts: Year
Amount
1962
$ 5,190.91
1963
8,090.73
1964
16,661.02
1965
17,309.68
The parties have stipulated that the Internal Revenue Service, by use of the net worth method, accurately redetermined petitioner's taxable income and tax deficiencies. Petitioner, a college graduate with a bachelor of science degree in secondary education, majored in commerce and completed 12-1/2 semester hours of accounting. ULTIMATE FINDING OF FACT Some part of petitioner's underpayment of income tax required to be shown on each of his 1962, 1963, 1964, and 1965 Federal income tax returns was due to petitioner's fraud. OPINION The only issue we must decide is whether any part of the admitted underpayment of income taxes required to be shown on petitioner's income tax returns was due to petitioner's fraud with an intent to evade taxes. Upon considering all relevant facts and the entire record before us, we conclude that some part of the underpayment of income taxes required to be shown on petitioner's income tax returns for each of the years in question was due *189 to petitioner's fraud. Accordingly, respondent may assess both the admitted income tax deficiency and the asserted fraud penalty for each taxable year.
Section 6653(b) provides that, "If any part of an underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment." In the event that fraud is shown, there is no statute of limitations barring the assessment of taxes. Sec. 6501(c)(1). In a fraud case, the burden of proof is on the respondent. Sec. 7454(a). This burden can only be satisfied by clear and convincing evidence. Miller v. Commissioner, 51 T.C. 915, 918 (1969); Rule 142(b), Tax Court Rules of Practice and Procedure. Whether fraud exists is a question of fact. Stratton v. Commissioner, 54 T.C. 255, 284 (1970). The facts must show that there has been a willful attempt by the taxpayer to evade taxes. "Such a willful attempt to evade tax may be found from any conduct calculated to mislead or conceal." Beaver v. Commissioner, 55 T.C. 85, 93 (1970). Several factors must be considered to determine whether a taxpayer has acted fraudulently in underreporting his income. Consistently *190 understating income on returns filed with the Commissioner, while standing alone might not support a finding of fraud, constitutes strong evidence of fraud. Camien v. Commissioner, 420 F. 2d 283, 288 (8th Cir. 1970), affg. a Memorandum Opinion of this Court. During the years in question, the parties agree that petitioner's reported taxable income and unreported income were as follows: Taxable Income
Unreported Year
Reported
Income
1962
$9,825.86
$ 5,190.91
1963
1,236.98
8,090.73
1964
4,742.64
16,661.02
1965
3,570.99
17,309.68
We can only conclude that petitioner significantly, systematically, and consistently understated his income. We do not, however, rely on this fact alone to conclude that petitioner acted fraudulently. Another factor considered indicative of fraud is the maintenance of inadequate and incomplete records. McManus v. Commissioner, T.C. Memo. 1972-200, affd. mem. 486 F. 2d 1399 (4th Cir. 1973). Petitioner's only business records for SLP, his sole proprietorship, were bank deposit slips, cancelled checks, bank statements, expense invoices, and adding machine tapes. The parties have stipulated that based on these records petitioner reported gross income from SLP that was equal *191 to the total amount deposited in SLP's business account, less non-income items deposited in that account, and adjusted for SLP's beginning and ending accounts receivable. On at least three occasions, petitioner represented to William Horner, an Internal Revenue Service Special Agent, that all of SLP's gross receipts were properly deposited in SLP's business account. The inference of this representation is, of course, that petitioner's gross income from SLP could be accurately determined from SLP's bank statements and deposit slips, SLP's only records. The parties now agree, contrary to petitioner's representations to Horner, that petitioner received at least $11,125 from SLP's operations that was not deposited, and therefore not recorded. SLP's only records of income items were deposit slips, and since petitioner falsely maintained that all income items received by SLP were properly deposited, we must conclude that petitioner maintained misleading records, and with those records attempted to mislead Horner. The inference that SLP's records were falsely maintained is reinforced by the observation that several income items were cashed, but not deposited in SLP's account, on the same *192 date that other items were properly deposited in SLP's bank account. Some of the cashed items were then used to purchase money orders, make loan payments, or purchase certificates of deposit. If petitioner had intended to use SLP's deposit slips as accurate records of SLP's gross income, all items would have been deposited on each visit to the bank. Petitioner has attempted to counter the inference of the improperly maintained records by suggesting that, "if fraud did exist, it was not his," but rather his ex-wife's and his deceased brother's. Petitioner contends that his brother and ex-wife kept all of SLP's records, and therefore, any errors or misrepresentations contained therein were their errors or misrepresentations, not petitioner's. The facts contradict this contention. First, petitioner is the person who presented and explained to Gasper, petitioner's accountant, information regarding SLP's income so that Gasper could complete petitioner's income tax returns. If petitioner was not responsible for SLP's books and records, it is difficult to explain why he, rather than someone else, was the one who supplied Gasper with worksheets and personally answered Gasper's questions *193 regarding SLP's operations and recordkeeping. Second, of those income items not deposited, at least some were used to make interest and principal payments on loans. Petitioner does not attempt to explain why his brother and ex-wife would purposely avoid depositing income items in SLP's bank account, but then use the money from the cashed items to make principal and interest payments on loans. Third, petitioner has established a consistent pattern of making false statements. While undergoing audit, petitioner contended that all of SLP's income items were deposited; all were not. Petitioner contended that he purchased no money orders or bank drafts during the years in question. In fact, he purchased over $14,000 worth of such items. Petitioner denied maintaining any bank accounts in St. Joseph, Missouri, during 1961 through March 14, 1967. During this period, he maintained two accounts under assumed names. Finally, petitioner denied owning more than $6,000 in savings bonds during the years in question. He now admits he purchased and owned over $15,000 in savings bonds between 1962 and 1965. We therefore are unable to accept petitioner's argument, without corroborating evidence, *194 that all fraudulent activities were solely the responsibility of his brother's and his ex-wife's alleged recordkeeping. In addition to consistently understating income and maintaining erroneous and misleading records, a taxpayer's education level is frequently considered in determining whether fraud has been committed. See e.g. Iley v. Commissioner, 19 T.C. 631, 635 (1952).Petitioner, a college graduate, majored in commerce and had 12-1/2 semester hours of accounting. As a result of his education, petitioner was certainly aware of the importance, for income tax purposes, of keeping accurate and appropriate records. Nevertheless, he knowingly maintained inaccurate records that failed to reflect substantial portions of income. From these records he prepared income summaries that he gave to his accountant who prepared petitioner's income tax returns.We must conclude that petitioner was well aware that his inaccurate recordkeeping would eventually result in substantial underpayments of income tax. Finally, we view petitioner's conduct throughout the entire audit and trial as indicative of a specific intent to evade income taxes. On several occasions petitioner made false statements *195 to agents investigating his income taxes: he maintained that he had deposited all income items in SLP's accounts; he claimed to have purchased no certificates of deposit, money orders or treasury bonds; he maintained at least two undisclosed bank accounts under assumed names. Furthermore, at trial, petitioner called no witnesses to corroborate petitioner's allegations that his brother and ex-wife were the ones responsible for the fraudulent income tax returns. Of special significance, petitioner did not attempt to elicit supportive testimony from Gasper, a disinterested party, who was present during Horner's March 1, 1967, interview with petitioner. Horner testified that during that interview petitioner claimed all income items were deposited in SLP's business account, and petitioner also stated that he alone compiled all of SLP's income tax information. If, as petitioner maintains on brief, Horner's testimony was in error on these matters, petitioner should have called Gasper as petitioner's witness to refute Horner's testimony. [2] *196 Because petitioner consistently failed to report substantial amounts of taxable income, consistently made false statements to agents investigating his income tax returns, maintained erroneous, misleading, and knowingly inaccurate records, and finally because petitioner, an educated individual, was fully aware that his inaccurate and misleading records would eventually result in an underpayment of income taxes, we conclude petitioner's admitted underpayment of taxes in each of the four years in question was due, in part, to petitioner's fraud. Petitioner is therefore liable for the additions *197 to tax imposed by section 6653(b), and further, respondent is not barred from assessing petitioner's income tax deficiencies for 1962 through 1965. Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. Petitioner maintains that no statements made to Horner are admissible since before each interview either a defective Miranda warning was given, or no Miranda warning was given. Miranda v. Arizona, 384 U.S. 436 (1966). Petitioner is mistaken. First, this case is a civil, not criminal fraud case. Miranda warnings do not apply to such cases. Brod v. Commissioner, 65 T.C. 948 (1976); Harper v. Commissioner, 54 T.C. 1121 (1970). Second, even in criminal fraud cases there must be a showing that the interviews took place while the taxpayer was in custody. Beckwith v. United States, 425 U.S. 341↩ (1976).At least two of the interviews with petitioner were noncustodial. Petitioner has not attempted to prove the remaining interviews were custodial.